ROBERT C. O'BRIEN (SBN 154372)
DAVID G. BAYLES (SBN 208112)
**ARENT FOX LLP**
555 West Fifth Street, 48th Floor
Los Angeles, CA  90013-1065
Telephone:  213.629.7400
Facsimile:   213.629.7401
Email:  obrien.robert@arentfox.com
Email:  bayles.david@arentfox.com

ANTHONY V. LUPO (Adm. *Pro Hac Vice*)
**ARENT FOX LLP**
1050 Connecticut Avenue, NW
Washington, D.C. 20036
Telephone:  202.857.6000
Facsimile:   202.857.6395
E-mail:  lupo.anthony@arentfox.com

Attorneys for Plaintiff
THE HEBREW UNIVERSITY OF
JERUSALEM

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE HEBREW UNIVERSITY OF JERUSALEM, | Case No.  CV10-3790-AHM (JCx) |
| Plaintiff, | **THE HEBREW UNIVERSITY OF JERUSALEM'S TRIAL BRIEF** |
| v. | |
| GENERAL MOTORS LLC, | **Trial:  September 4, 2012** |
| Defendant. | |

PLAINTIFF THE HEBREW UNIVERSITY OF JERUSALEM, pursuant to

Local Rule 16-10, hereby submits its Trial Brief:

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

CV10-3790-AHM (JCx)

TECH/1181056.1

HUJ'S TRIAL BRIEF

# **TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ................................................................................. 1

II.   THE COURT SHOULD FIND THAT HUJ OWNS
EINSTEIN'S RIGHTS OF PUBLICITY ............................................. 3

   A.  LEGAL STANDARD ................................................................ 3

   B.  HUJ WILL PROVE BY A PREPONDERANCE OF THE
EVIDENCE THAT EINSTEIN'S PROBABLE INTENT
WAS TO INCLUDE HIS RIGHTS OF PUBLICITY IN
THE TRUST ............................................................................... 4

   C.  ONCE THE COURT CONCLUDES AS A MATTER OF
LAW THAT THE HUJ OWNS DR. EINSTEIN'S
RIGHTS OF PUBLICITY, OWNERSHIP UNDER CAL.
CIV. CODE. § 3344.1(b) IS ALSO ESTABLISHED ................. 11

III.   THE QUESTION OF THE COMMERCIAL VALUE OF DR.
EINSTEIN'S POSTMORTEM RIGHTS OF PUBLICITY AT
HIS DEATH DOES NOT GO TO THE JURY ................................. 16

IV.   GM IMPROPERLY READS AN ADDITIONAL ELEMENT
OF "ACTS OCCURING IN CALIFORNIA" INTO THE
CALIFORNIA STATUTORY CLAIM ............................................. 17

V.   THE COURT SHOULD DISMISS GM'S LONE DEFENSE
BEFORE TRIAL OR BEFORE INSTRUCTING THE JURY .......... 18

VI.   CONCLUSION ................................................................................. 19

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Ansel Adams Pub. Rights Trust v. PRS Media Partners, LLC,*
  2010 WL 4974114 (N.D. Cal. Dec. 1, 2010) ..................................... 19

*Butkus v. Downtown Athletic Club of Orlando, Inc.,*
  2008 WL 2557427 (C.D. Cal. April 2, 2008) ..................................... 19

*Downing v. Abercrombie & Fitch,*
  265 F.3d 994 (9th Cir. 2001) ..................................................... 18

**STATE CASES**

*Comedy III Prods., Inc. v. Saderup, Inc.,*
  25 Cal.4th 387 (2001) ("*Comedy III*") ....................................... 2, 18, 19

*Dora v. Frontline,*
  15 Cal. App. 4th 536 (1993) ....................................................... 17

*Fidelity Union Trust Co. v. Robert*
  36 N.J. 561, 178 A.2d 185 (N.J. 1962) ............................................ 4

*In the Matter of the Estate of Reininger,*
  388 N.J. Super. 289, 907 A.2d 1024 ............................................... 4

*In re Douglass' Estate,*
  70 Cal. App. 2d 279 (1945) ..................................................... 13, 14

*In re Estate of Becker,*
  270 Cal. App. 2d 31 (1969) ..................................................... 13, 14

*In re Estate of Branigan,*
  129 N.J. 324 (1992) .............................................................. 3, 13

*In re Estate of Gabrellian,*
  372 N.J. Super. 432 (2004) ....................................................... 3, 13

*In re Estate of Randall,*
  240 Cal. App. 2d 85 (1966) ......................................................... 14

*KNB Enterprises v. Matthews,*
  78 Cal. App. 4th 362 (2nd Dist. 2000) ............................................. 17

*Lugosi v. Universal,*
  603 P. 2d 425 (1979) ............................................................... 17

*Presley v. Grant,*
  2002 WL 31547000 (Cal. Ct. App. Nov. 18, 2002) .................................. 19

*Wilson v. Flowers*,
    58 N.J. 250 (1971)....................................................................................... 4

*Winter v. DC Comics*,
    30 Cal. 4th 881 (2003).............................................................................. 19

**STATE STATUTES**

Cal. Civ. Code § 3344.1(b)..............................................................passim

Cal. Civ. Code. §3344.1(n).................................................................... 18

Cal. Civil Code § 3344.1 ................................................................ 13, 15

**RULES**

Fed. R. Evid. 201 ................................................................................... 16

**OTHER AUTHORITIES**

2 J. Thomas McCarthy, Rights of Publicity and Privacy § 6:39............................ 16

## I.   INTRODUCTION

The Court and Jury will decide several very interesting issues of law and fact at trial.  The Court has the honor of deciding probably the most fascinating of the issues:  how Dr. Albert Einstein—the first celebrity genius—would have handled the disposition of his postmortem rights of publicity in his will if he had envisioned the present inquiry (his "probable intent").

Defendant General Motors, LLC ("GM") believes Dr. Einstein's probable intent was to allow his post mortem rights of publicity—the asset in his estate with the greatest potential value—to pass in his Will to his stepdaughter, Margot Einstein.  Accordingly, GM believes, in essence, the wrong plaintiff sued it for publishing the "Buff Einstein" ad in *People* magazine and it should therefore be absolved from liability for its blatant disrespect of the intellectual property of others.  GM is wrong.  GM cannot support its assertion from a plain construction of the Will.  In the Will, Dr. Einstein provided merely a modest monetary bequest to his stepdaughter plus (secondary lifetime beneficiary) income rights in his testamentary Trust.  And then, his stepdaughter was only entitled to receive such additional income as she may have needed to pay medical bills late in life.  Dr. Einstein clearly wanted to take care of her (and his absolutely devoted secretary, Helen Dukas) but only in "the modest life style to which they were accustomed." Tr. Exh. 1, Nathan Aff., ¶ 16.  Dr. Einstein clearly did not intend to settle his greatest asset on her.

The Hebrew University of Jerusalem is the right plaintiff.  It is the owner of Dr. Einstein's postmortem rights of publicity.  It has been licensing those rights for 27 years.  Construction of Dr. Einstein's Will in this case will confirm its ownership rights.  The correct construction based on the very language in the Will, plus testimony from Otto Nathan and David Levy, shows a special favoritism for The Hebrew University of Jerusalem both in life and at death.  Dr. Einstein's expressed intent to improve the University's standing as an institution clearly

1    supports a finding that his probable intent in his Will was to dispose of his rights of

2    publicity in a manner to assure that the University could use his name, likeness and

3    image to help it grow—just like he did when, while living, he served as a founder,

4    on the first Board of Trustees, raised money for the University, and recorded a film

5    "promoting" it.  This brief articulates all these and other reasons why the Court will

6    have much to consider at trial from which to construe the Will in the manner

7    advocated by the University.

8          The parties have elsewhere already briefed many of the other key issues in

9    the case.  The University therefore touches only lightly in this brief on three of the

10   key issues which remain unresolved:  (1) why GM's dogged (and incorrect)

11   insistence that the commercial value of Einstein's rights of publicity as of his death

12   should not be a question for the jury in this case, (2) why GM's unnecessary

13   imposition of the additional element that "acts occurred in California" is not a

14   necessary element of the Third Claim for Relief, and (3) the propriety and benefits

15   of immediate dismissal of GM's defense under *Comedy III*.

16         The trial should be interesting for everyone that attends and participates.  The

17   University will offer a variety of demonstrative exhibits, key video clips of trial

18   exhibits and a power point presentation to efficiently display and help explain the

19   facts and maintain everyone's interest.  At the conclusion of trial, the University

20   will respectfully request that the Court confirm its ownership claims to Dr.

21   Einstein's post mortem rights of publicity under both the New Jersey common law

22   and California Civil Code §3344.1(b).  Assuming the Court rules for the University,

23   it will then ask the jury to find infringement of those rights and order GM to pay

24   damages for GM's malicious and unauthorized use.

25

26

27

28

## II. THE COURT SHOULD FIND THAT HUJ OWNS EINSTEIN'S RIGHTS OF PUBLICITY

Trial Exhibit 1 is a collection of affidavits from Einstein's friend (Otto Nathan), and the attorney that drafted his Wills (David Levy).  Dr. Einstein's last Will is an exhibit within Exhibit 1 and it is also Trial Exhibit 62.  Exhibits 1 and 62 will be admitted at trial without objection pursuant to the parties' stipulation. Exhibit 1 is the principal evidence the Court must construe to decide Einstein's "probable intent" regarding his rights of publicity.  HUJ will demonstrate at trial that the Will and affidavits show Einstein's probable intent was to convey the rights of publicity into his testamentary trust for the lifetime benefit of his secretary and step daughter, then outright to HUJ.

### A. LEGAL STANDARD

The parties agree that New Jersey law must govern the Court's construction of the Will to determine the disposition of Einstein's post mortem publicity rights. *See* GM's [Proposed] Findings of Fact and Conclusions of Law, filed August 27, 2012, Docket No. 172.[1]  New Jersey law requires the Court to apply  the doctrine of probable intent to the construction of Einstein's will under which the Court must give "primary emphasis to [the testator's] dominant plan and purpose as they appear from the *entirety of his will* when read and considered in light of the surrounding facts and circumstances."  *In re Estate of Branigan*, 129 N.J. 324, 332 (1992) (emphasis added); *see also In re Estate of Gabrellian*, 372 N.J. Super. 432,

---

[1] Accordingly, by the filing of its Proposed Findings of Fact and Conclusions of Law, GM waived, once and for all, its claim that New Jersey and California may give a different result on the question of the ownership of Einstein's rights of publicity. *See* Docket No. 172, page 3, GM's proposed Conclusion of Law No. 2 ("Because Albert Einstein was domiciled in New Jersey when he died, New Jersey law controls disposition of his post-mortem publicity rights in his Will.")  GM also did not offer a proposed Conclusion of Law to account for its absurd objection to HUJ's Proposed Jury Instruction No. 302, i.e., a finding that HUJ is the owner of Einstein's Rights of Publicity under New Jersey law but not for purposes of Cal. Civ. Code § 3344.1(b).  *See also* HUJ's Response to GM's Objection to HUJ's Proposed Jury Instruction No. 302 filed August 27, 2012, Docket No. 170.

1    441 (2004) (noting doctrine analyzes "the entirety of the will in light of the

2    circumstances surrounding the execution of the will").  So far as the situation fairly

3    permits, under the doctrine of probable intent, courts will ascribe to the testator,

4    'those impulses which are common to human nature, and will construe the will so

5    as to effectuate those impulses.'"  *Fidelity Union Trust Co. v. Robert*  36 N.J. 561,

6    564-565, 178 A.2d 185, 187 (N.J. 1962).  Similarly, "Courts are enjoined to 'strain'

7    toward effectuating the testator's intent 'to accomplish what he would have done

8    had he envisioned the present inquiry.'") (quoting *Fidelity*, 36 N.J. at 564-68).  *In*

9    *re Estate of Branigan*, 129 N.J. 324, 332 (1992).     Extrinsic evidence may be

10   consulted to assist the Court in determining Einstein's probable intent.  *See*

11   Summary Judgment Order, March 16, 2012, Docket No. 137, page 21, quoting

12   *Wilson v. Flowers*, 58 N.J. 250, 263 (1971).

13        In addition, the parties agree that the Court should apply a preponderance of

14   the evidence standard to the construction of the Will.  *See* the parties respective

15   Proposed Findings of Fact and Conclusions of Law, filed August 27, 2012, Docket

16   Nos. 172 and 173, *citing In the Matter of the Estate of Reininger*, 388 N.J. Super.

17   289, 298, 907 A.2d 1024, 1030.  The preponderance of the evidence question for

18   probable intent is framed under New Jersey law as whether a  "reasonably cautious

19   mind" applying the doctrine of probable intent to the offered hypothesis, namely

20   that Dr. Einstein intended to transfer his postmortem rights of publicity to The

21   Hebrew University of Jerusalem by his Will, is a "rational inference" … "grounded

22   in a preponderance of probabilities according to common experience."  *Id.*

23        **B.    HUJ WILL PROVE BY A PREPONDERANCE OF THE**
             **EVIDENCE THAT EINSTEIN'S PROBABLE INTENT**
24           **WAS TO INCLUDE HIS RIGHTS OF PUBLICITY IN**
             **THE TRUST**

25

26        All of the following facts (most of which are undisputed) and the reasonable

27   inferences there from, demonstrate by a preponderance of the evidence that Dr.

28

Einstein intended to include his rights of publicity in his testamentary trust for ultimate disposition in HUJ free of the trust:

1.     Dr. Albert Einstein was a German-born theoretical physicist who is best known for his scientific theories including, but not limited to, his theory of relativity and unified field theory.  Pretrial Conference Order, Admitted Fact No. 1.

2.     Dr. Einstein was the winner of the Nobel Prize in Physics in 1921.  Pretrial Conference Order, Admitted Fact No. 2.

3.     In addition to his contributions to science, Dr. Einstein was an acclaimed political activist and humanitarian.  Pretrial Conference Order, Admitted Fact No. 3.

4.     As a result of his success in his various scientific and non-scientific endeavors, Dr. Einstein became respected and famous.  Pretrial Conference Order, Admitted Fact No. 4.

5.     Dr. Einstein was aware of and exploited the value of his rights of publicity during his lifetime.  Pretrial Conference Order, Stipulated Fact Subject to Objection, No. 2; Tr. Exh. 145; Tr. Exhs. 33, 119-121; Summary Judgment Order, March 16, 2012, Docket No. 137, page 5.  Reasonable inference from all of the Admitted and Stipulated Facts in the Pretrial Conference Order and it is also the appropriate subject of Judicial Notice.

6.     Dr. Einstein lent his name to various charitable causes during his lifetime.  Pretrial Conference Order, Stipulated Fact Subject to Objection, No. 2.

7.     Dr. Einstein lent his name to promote a medical school at Yeshiva University and prevented the use of his name by another organization.  Tr. Exhs. 39 and 40.[2]

---

[2] The parties have not yet met and conferred regarding exhibit foundation stipulations as required by the Court's Standing Order Re: Civil Jury Trials, VI.D.  HUJ requests that GM stipulate to foundation as to these exhibits.  Certain articles, these among them, may be downloaded from the online NYT archives.  All of the newspapers HUJ used to support its summary judgment opposition were obtained

8.    Dr. Einstein was one of the founders of The Hebrew University of Jerusalem. Tr. Exh. 1, Levy Aff., ¶ 12; Testimony of Chaya Becker and Pepi Yakirevich;[3] Tr. Exhs. 145, 264-266.

9.    Dr. Einstein served on the first Board of Trustees of The Hebrew University of Jerusalem.  Chaya Becker and Pepi Yakirevich Testimony.

10.   Dr. Einstein delivered the first scientific lecture at The Hebrew University of Jerusalem.  Chaya Becker and Pepi Yakirevich Testimony.

11.   Dr. Einstein used his fame to raise money to promote The Hebrew University of Jerusalem.  Tr. Exhs. 145, 264-266; Testimony of Chaya Becker and Pepi Yakirevich.

12.   Dr. Einstein appeared in a film in which he stated his purpose was to "promote the cause of The Hebrew University of Jerusalem."  Tr. Exh. 145; Chaya Becker and Pepi Yakirevich Testimony.

13.   Dr. Einstein considered The Hebrew University of Jerusalem "his" University, hoped it would grow, make "rapid progress," and that all those who heard the remarks he delivered at the University's opening ceremonies, would cooperate in helping the University to grow and accomplish its mission.  Tr. Exh. 1, Levy Aff., ¶ 12 and "The Mission of Our University," by Albert Einstein, attached to the Levy Aff.

in this manner by an Arent Fox legal assistant.  These exhibits were also obtained by her in the same manner.  If GM objects to foundation/authenticity, HUJ will have Chaya Becker or Lisa Soboslai reproduce the act of locating the article and then testify about her efforts.  That would be an unnecessary waste of *everyone's* time at trial.

[3] On August 27, 2012, GM filed an objection to any testimony on the question of probable intent.  That objection should be overruled because Trial Exh. 1 includes significant testimony on the question of probable intent.  In addition, Dr. Einstein's probable intent is informed by this testimony about the important role Dr. Einstein played in the formation of HUJ.  *See also* Fact Nos. 9-11.

14. Dr. Einstein had a "great" and "particular" interest in the creation and development of The Hebrew University of Jerusalem. Tr. Exh. 1, Nathan Aff., ¶ 18.

15. Dr. Einstein wanted everything "representing the embodiment of his life's work, to be assembled at The Hebrew University." Tr. Exh. 1, Levy Aff., ¶ 7.

16. Dr. Einstein died in 1955, while domiciled in New Jersey. Pretrial Conference Order, Admitted Fact No. 5.

17. Dr. Einstein disposed of his property through a Last Will and Testament dated March 18, 1950 (the "Will"). Pretrial Conference Order, Admitted Fact No. 6; Tr. Exh. 1, Nathan Affidavit Exhibit, Tr. Exh. 62.

18. In the Thirteenth Article of the Will, Dr. Einstein bequeathed "all of [his] manuscripts, copyrights, publication rights, royalties and royalty agreements, and all other literary property and rights, of any and every kind or nature whatsoever" to a trust ("Trust") for the lifetime benefit of Helena Dukas, his secretary, and Margot Einstein, his stepdaughter. Pretrial Conference Order, Admitted Fact No. 7. The Will, Tr. Exhs. 1 and 62.

19. Other than the property that was transferred to the Trust by the Will, the only other specific bequests in the Will were cash bequests, furniture and household goods, his violin and personal effects. The Will, Tr. Exhs. 1 and 62, ¶¶ 2-9.

20. Literary property and rights of publicity are intellectual property. *See* Summary Judgment Order, March 16, 2012, Docket No. 137, page 8.

21. The only intellectual property that was transferred in the Will was transferred to the Trust. The Will, Tr. Exhs. 1 and 62; Summary Judgment Order, March 16, 2012, Docket No. 137, page 8.

22. Dr. Einstein's testamentary plan for the Trust was merely to "on the one hand … permit for the support and maintenance after his death of his absolutely

1    devoted secretary, Helen Dukas, and his daughter [Margot Einstein], and at

2    the same time leave his literary property to the Hebrew University…"  Tr.

3    Exh. 1, Nathan Aff., ¶ 18.

4    23.    The purpose and intent of Dr. Einstein in connection with the support

5    payments provided for Helena Dukas and Margot Einstein in the Trust was to

6    help them remain in "the modest life style to which they were accustomed,

7    but including their extra needs for medical or other similar care that might

8    arise in their later years."  Tr. Exh. 1, Nathan Aff., ¶ 16.

9    24.    There is in the Will a "patent and overriding purpose of preserving the

10    manuscripts, papers and other literary property for the Hebrew University

11    …"  Tr. Exh. 1, Levy Aff., ¶ 14.

12    25.    "The intent of Albert Einstein regarding the trust of his literary property

13    cannot be determined from particular words or phrases read literally and in

14    disregard of the fundamental objectives and purposes pervading the

15    document as a whole and which the will sought to achieve."  Tr. Exh. 1,

16    Levy Aff., ¶ 15.

17    26.    The "two dominant purposes" of the Will were, "first, fulfillment of

18    perceived obligations of reasonable support for his two charges (Helen Dukas

19    and Margot Einstein) and second, the preservation of his Collected Works in

20    perpetuity through the instrumentality of the Hebrew University and for the

21    benefit of mankind."  Tr. Exh. 1, Levy Aff., ¶ 15.

22    27.    The two dominant purposes of the Will "should not be deterred or obscured

23    by microscopic scrutiny of words, phrases and technical concepts, nor by

24    subsequent changes in legal concepts which ought not to be retroactively

25    applied."   Tr. Exh. 1, Levy Aff., ¶ 15.

26    28.    The Thirteenth Article of the Will contains no limiting or exclusionary words

27    to describe the rights transferred and, specifically, nothing to exclude the

28    rights of publicity from the meaning of "and rights, of any and every kind or

1    nature whatsoever" as that phrase is used in the Article.  The reference to

2    "literary property" in the Thirteenth Article of the Will was simply

3    descriptive and not limiting.  The Will, Tr. Exhs. 1 and 62.

4    29.    The Will provided that the Trust would terminate upon the death of Helen

5    Dukas and Margot Einstein, whereupon property in the Trust would pass to

6    The Hebrew University of Jerusalem.  Pretrial Conference Order, Admitted

7    Fact No. 8.

8    30.    The trustees and beneficiaries of the Trust terminated the Trust and conveyed

9    to The Hebrew University of Jerusalem all property remaining in the Trust,

10   effective January 1, 1982.  Pretrial Conference Order, Admitted Fact No. 9;

11   Tr. Exh. 62.

12   31.    In 1985, the American Friends of Hebrew University, acting on behalf of The

13   Hebrew University of Jerusalem, retained the Roger Richman Agency as its

14   agent to license Dr. Einstein's name, image, or likeness for third party use

15   and to prevent others from doing so without the University's consent.

16   Pretrial Conference Order, Admitted Fact No. 10.

17   32.    Even in death, Dr. Einstein remains a famous person. Pretrial Conference

18   Order, Admitted Fact No. 11.

19   33.    In 1999, Time Magazine named Albert Einstein the Person of the Century.

20   Pretrial Conference Order, Stipulated Fact Subject to Objection, No. 1; Tr.

21   Exh. 338.

22   34.    Dr. Einstein's name and image are synonymous with "genius."  Reasonable

23   inference from all of the Admitted and Stipulated Facts in the Pretrial

24   Conference Order and appropriate subject of Judicial Notice.

25   35.    The postmortem rights of publicity of Dr. Einstein are very valuable.  All

26   licensing agreements admitted at trial.  Testimony of Pepi Yakirevich, Chaya

27   Becker, Lisa Soboslai, Kevin Connelly, Fernando Torres and James

28   Pampinella.

1   Based upon all the foregoing findings of fact, including from the nature of

2   the property listed in the Trust, compared against the other property specifically

3   bequeathed, the expansiveness of the language "and rights, of any and every kind or

4   nature whatsoever" describing the property in the Trust, and all the facts found

5   above providing insight into the dominant purposes of Dr. Einstein's testamentary

6   intent, and all of Dr. Einstein's efforts during his life to promote and support The

7   Hebrew University of Jerusalem, the Court should find by a preponderance of the

8   evidence all of the following facts:

9   36.   Dr. Einstein's probable intent was to include his post mortem rights of

10        publicity in the Trust.  The Will, Tr. Exhs. 1 and 62; reasonable inference

11        from all of the facts found above, including, specifically, all of the Admitted

12        and Stipulated Facts in the Pretrial Conference Order;

13   37.   If Dr. Einstein had envisioned the present inquiry, his probable intent would

14        have been to transfer his postmortem rights of publicity to The Hebrew

15        University of Jerusalem by the Trust.  The Will, Tr. Exhs. 1 and 62;

16        reasonable inference from all of the facts found above, including,

17        specifically, all of the Admitted and Stipulated Facts in the Pretrial

18        Conference Order;

19   38.   If Dr. Einstein had envisioned the present inquiry, his probable intent would

20        have been to transfer his postmortem rights of publicity to The Hebrew

21        University of Jerusalem by the Trust rather than to Margot Einstein by the

22        residuary clause of the Will because he clearly intended by his Will to merely

23        satisfy her support needs during her life and it would have been unnecessary

24        to provide for her support needs by transferring ownership of his postmortem

25        rights of publicity to her via the residuary clause.  The Will, Tr. Exhs. 1 and

26        62; reasonable inference from all of the facts found above, including,

27        specifically, all of the Admitted and Stipulated Facts in the Pretrial

28        Conference Order; and, therefore,

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

CV10-3790-AHM (JCx)
TECH/1181056.1

- 10 -

HUJ'S TRIAL BRIEF

39.    The Hebrew University of Jerusalem is the owner of all the rights of publicity of Dr. Einstein.  The Will, Tr. Exhs. 1 and 62; reasonable inference from all of the facts found above, including, specifically, all of the Admitted and Stipulated Facts in the Pretrial Conference Order.

Based upon all of the foregoing findings of fact and the application of the law, the Court should also therefore conclude, as a matter of law, that The Hebrew University of Jerusalem is:

40.    The owner of the rights of publicity of Dr. Einstein for purposes of prosecuting the Fourth Claim for Relief in this action for infringement of the New Jersey common law postmortem rights of publicity.

**C.    ONCE THE COURT CONCLUDES AS A MATTER OF LAW THAT HUJ OWNS DR. EINSTEIN'S RIGHTS OF PUBLICITY, OWNERSHIP UNDER CAL. CIV. CODE. § 3344.1(B) IS ALSO ESTABLISHED**

California Civil Code section 3344.1(b) provides that:

> The rights recognized under this section are property rights, freely transferable or descendible, in whole or in part, by contract or by means of any trust or any other testamentary instrument, executed before or after January 1, 1985.  The rights recognized under this section . . . shall vest in the persons entitled to these property rights under the testamentary instrument of the deceased personality effective as of the date of his or her death.  In the absence of an express transfer in a testamentary instrument of the deceased personality's rights . . . a provision in the testamentary instrument that provides for the disposition of the residue of the deceased personality's assets shall be effective to transfer the rights recognized under this section in accordance with the terms of that provision.

If the Court construes the Will and finds that the University is the owner of Dr. Einstein's rights of publicity under New Jersey law, it will also determine that HUJ is the person in whom the rights *vest* for purposes of the Third Claim for Relief under California statutory law.  As stated in the second sentence of section 3344.1(b), the rights of publicity "shall vest in the persons *entitled* to these property rights under the testamentary instrument of the deceased personality" (emphasis

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

CV10-3790-AHM (JCx)
TECH/1181056.1

- 11 -

HUJ'S TRIAL BRIEF

1   added).  The identity of the persons *entitled* to Dr. Einstein's rights of publicity is

2   precisely the foundational fact the Court must find at trial for this action to proceed.

3   The Court has also already determined it must accomplish this finding by analyzing

4   Dr. Einstein's "probable intent."  (*See* Summary Judgment Order, March 16, 2012,

5   Docket No. 137, page 6 ("[d]etermining what Einstein would have done . . .

6   primarily through reference to what he actually did, especially by assessing the

7   Will's language and the facts and circumstances surrounding its creation")).

8        If the Court finds that it would have been Dr. Einstein's probable intent to

9   include his rights of publicity in the bundle of intellectual property rights he

10  transferred to the trust established by the Thirteenth Article of his Will, then HUJ

11  would be the "person entitled" to this right under Dr. Einstein's Will so construed.

12  Indeed, the concept of probable intent gives "primary emphasis to [the testator's]

13  dominant plan and purpose as they appear from the *entirety of his will* when read

14  and considered in light of the surrounding facts and circumstances."  *In re Estate of*

15  *Branigan*, 129 N.J. 324, 332 (1992); *see also In re Estate of Gabrellian*, 372 N.J.

16  Super. 432, 441 (2004) (noting doctrine analyzes "the entirety of the will in light of

17  the circumstances surrounding the execution of the will").

18       In its related jury instruction objections, however, GM improperly seizes upon

19  the words "express transfer" in the third sentence of section 3344.1, to conclude,

20  essentially, that a decedent must actually use the words "rights of publicity" in the

21  Will for a person to be entitled to the decedent's rights of publicity *vis a vis* any

22  person taking property by a residual clause in the Will.  GM is mistaken.  The use of

23  an open-ended proviso in a will to convey a decedent's right of publicity constitutes

24  an "express transfer" under section 3344.1(b).  Section 3344.1's use of the term

25  "express" is obviously meant to signify whether any of the language expressed by the

26  decedent in his or her will demonstrated his or her probable intent to convey the right

27  of publicity to someone other than by the residual clause of the will, if any.  It does

28

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

CV10-3790-AHM (JCx)
TECH/1181056.1

- 12 -

HUJ'S TRIAL BRIEF

1   not mean that the decedent must use the express term "right of publicity" for a

2   conveyance to be valid.

3        In addition to being contrary to New Jersey law, as discussed above, and

4   which controls whether HUJ is the owner of Einstein's rights of publicity, such a

5   formalistic reading of the statute is directly contrary to how wills have long been

6   construed *by California courts*. *See In re Douglass' Estate*, 70 Cal. App. 2d 279,

7   283 (1945) ("the Legislature of this state has prescribed certain rules governing

8   courts in the interpretation of wills, among which are . . . . in construing a will the

9   intention to be sought for is not that which existed in the mind of the testator, but is

10  that which *is expressed by him in the language of the will*" (emphasis added)) & at

11  285 ("the duty imposed upon courts to construe the language of each will, as far as

12  possible, in accordance with the testamentary plan or scheme of the testator *as*

13  *expressed by him in his will*" (emphasis added)); *In re Estate of Becker*, 270 Cal.

14  App. 2d 31, 34 (1969)("Intent must be manifested through words or conduct;

15  inarticulated intent and unexecuted intent do not provide a suitable foundation to

16  effectuate a legal act.  Even where we may reasonably deduce *probable intent* we

17  still require some appropriate *expression* of that intent and some degree of

18  consistency between intent and its *expression* before we can conclude that intent

19  has revealed itself and conduct" (emphasis added)).  It is only when nothing in the

20  expressed language of the will can be interpreted (guided by the testator's intent) to

21  indicate the  conveyance of a right of publicity that section 3344.1(b) directs a

22  court's reference to a will's residual clause to divine who is the recipient of the

23  right. *Becker*, 270 Cal. App. 2d at 34 ("This brings us to the critical question in the

24  case: was her intent *expressed* with sufficient clarity to enable us to carry out her

25  purpose?" (emphasis added)).

26       Were section 3344.1(b) read in the manner suggested by GM, the state

27  legislature would have been making a dramatic departure from long-standing

28  principals governing the interpretation of wills used by California courts.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

CV10-3790-AHM (JCx)
TECH/1181056.1

- 13 -

HUJ'S TRIAL BRIEF

1   California courts have, where appropriate, read such open-ended provisions in wills

2   as words of *enlargement,* not *limitation* as suggested by GM.  Thus, California

3   courts have held that a will provision bequeathing "[a]ll of the rest of my personal

4   effects of every kind and description, including all of the rest of my silver, and all

5   of my linens and china" were "words of enlargement and *express* the idea that the

6   thing in question constitutes only a part of a greater whole" so as to include the

7   conveyance of the decedent's automobiles.  *See In re Douglass' Estate*, 70 Cal.

8   App. 2d at 284, 287 (emphasis added).  Likewise, a will provision bequeathing

9   "[a]ll income derived from my several bank accounts, also all income derived from

10  all my stocks" was read as to include not only the decedent's income from those

11  two identified sources but also all other sources as well.  *In re Estate of Becker*, 270

12  Cal. App. 2d at 37.  Similarly, a bequest of "personal effects" was held to include

13  some $5,568 the decedent had deposited in her "patient fund account" at the

14  hospital where she had been committed for a long period.  *In re Estate of Randall*,

15  240 Cal. App. 2d 85 (1966).

16          In each of these cases the California courts found the will expressed the

17  intent to convey items above and beyond the class of items specifically enumerated

18  in the will provision in question.  HUJ's proposed reading of the Thirteenth Article

19  to Dr. Einstein's will is in accord with how these California courts have interpreted

20  other wills to divine whether the *expressed* language in the will would devise the

21  item of property in question.  In contrast, under GM's reading of section 3344.1(b)

22  the results in those cases would have been error in the special case of the

23  bequeathing of a right of publicity.  There is simply no basis offered by GM for

24  why the California state legislature would insist on such a specialized and unique

25  reading of wills in the case of bequeathing the right of publicity, one that is all

26  together contrary from what California courts consider as the expression of a

27  transfer of a right or property.

28

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

CV10-3790-AHM (JCx)
TECH/1181056.1

- 14 -

HUJ'S TRIAL BRIEF

1    GM's construction of the statute is simply inconsistent with the basic intent

2    underlying Section 3344.1(b)—which is to make sure that someone identified in a

3    person's will receives his or her right of publicity, indeed, specifically, where

4    contested, that it is received by the "person entitled" to it under the correct

5    construction of the will.  The Court is construing the Will.  If the Court construes

6    the Will to settle Einstein's rights of publicity in HUJ, then the "person entitled"

7    thereto will be established for purposes of 3344.1(b).  On the other hand, GM's

8    construction sets up traps for the unwary that would only increase the likelihood

9    that an individual's right of publicity could be lost after death if they failed to

10   utilize certain magic words and a residuary clause in their will.

11       In summary, the Court should construe the Will, interpret the California Civil

12   Code § 3344.1 in such as way as to find, as a matter of law, that plaintiff The

13   Hebrew University of Jerusalem  is the "person entitled" to Dr. Einstein's

14   postmortem rights of publicity under the Will and those rights vested in The

15   Hebrew University of Jerusalem through the Thirteenth Article of his Will, within

16   the meaning of Cal. Civ. Code § 3344.1(b), for purposes of prosecuting the Third

17   Claim for Relief in this action for infringement of the California statutory

18   postmortem right of publicity.

19   **III.   THE QUESTION OF THE COMMERCIAL VALUE OF DR. EINSTEIN'S POSTMORTEM RIGHTS OF PUBLICITY AT HIS**

20   **DEATH DOES NOT GO TO THE JURY**

21       GM has doggedly insisted since the initial filing of Proposed Pretrial

22   Conference Order, August 2001, that the commercial value of Einstein's rights of

23   publicity as of his death should be a question for the jury in this case.  GM is

24   wrong.

25       First, "commercial value at death" is not an element of the claim.  *See also* 2

26   J. Thomas McCarthy, Rights of Publicity and Privacy § 6:39 ("In the author's

27   opinion, everyone's persona and identity has some 'commercial value' during life

28

1    and at the time of death.  That value may be large or small, but it cannot be said to

2    be nonexistent, no matter how 'obscure' the person.")

3            Second, even if it is an element, the Court should take judicial notice that Dr.

4    Einstein's name or image had commercial value at his death pursuant to Fed. R.

5    Evid. 201.  The Rule allows HUJ to request judicial notice "at any stage of the

6    proceedings."  HUJ did so in the Joint filing pursuant to the Court's procedure for

7    settling jury instructions and its order at the Final Pretrial Conference on August 8,

8    2012, that the parties settle jury instructions on August 29, 2012.  In that request,

9    HUJ focused on stipulated and admitted facts, namely, the above-enumerated facts

10   nos. 1-4, 6 and 31-34.  After trial, if the Court has still not ruled on this element, it

11   will additionally ask for judicial notice that Dr. Einstein's name or image had

12   commercial value at his death based upon the above-enumerated facts nos. 5, 7, 11,

13   12, 34 and 35.  Fed. R. Evid. 201 allows judicial notice of any fact that is (1)

14   generally known within the trial court's territorial jurisdiction or (2) can be

15   accurately and readily determined from sources whose accuracy cannot reasonably

16   be questioned.  The totality of the foregoing facts certainly meet requirement (2).

17   The Court can also take judicial notice that the name and image of *Time's* Man of

18   the Century had commercial value based upon facts (1) generally known within this

19   Court territorial jurisdiction.

20           Finally, if the Court determines that it will send the question of "commercial

21   value at death" to the jury, the Court should essentially instruct the Jury that it may

22   be shown where the person was famous because:

23           (A)     Fame typically endows the name and likeness of the famous

24                   person with commercially exploitable opportunities;

25           (B)     The name and likeness of a person who is a celebrity within a

26                   designated group of persons is usually commercially exploitable to

27                   some extent; and,

28

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

CV10-3790-AHM (JCx)
TECH/1181056.1

- 16 -

HUJ'S TRIAL BRIEF

1       (C)     The use of the name or likeness of a famous or celebrated person

2             used without authorization usually causes commercial loss to the

3             famous or celebrated person.

4       *See KNB Enterprises v. Matthews,* 78 Cal. App. 4th 362, 367 fn. 6 (2nd Dist.

5    2000) ([T]here is "commercial loss inherent in the use by another" of the name or

6    identity of a famous or celebrated person.")  GM admits, as it must, that Einstein

7    "became respected and famous during life" and, even in death, Dr. Einstein

8    "remains a famous person."  *See* Pretrial Conference Order Section VI, Items 4 and

9    11.  Accordingly, the only reasonable conclusion based thereon is that Einstein's

10   name, image or likeness had commercial value at his death.  *See also Lugosi v.*

11   *Universal*, 603 P. 2d 425, 431 (1979) (fame typically endows the name and likeness

12   of the famous person with "commercially exploitable opportunities"); *Dora v.*

13   *Frontline*, 15 Cal. App. 4th 536, 542, fn 2 (1993) (the name and likeness of a person

14   who is a celebrity within a designated group of persons is usually "commercially

15   exploitable to some extent").

16   **IV.   GM UNNECESSARILY IMPOSES THE ADDITIONAL**

17   **ELEMENT OF "ACTS OCCURING IN CALIFORNIA" ON THE CALIFORNIA STATUTORY CLAIM**

18        GM's has unnecessarily tried to impose the following additional element

19   under the Third Claim for Relief:  "[that] acts occurred in California."  GM bases

20   its inclusion of this phrase in its proposed elements on Cal. Civ. Code. §3344.1(n),

21   which states:

22          This section shall apply to the adjudication of liability and the imposition of

23          any damages, and other remedies in cases in which the liability, damages, and other remedies arise from acts occurring directly in this state.

24

25   GM is improperly disputing this element.  GM admitted acts occurred directly in

26   this state, namely, distribution of the Advertisement nationally and, therefore, in

27   California, as well as sales of the Terrain in California at or about the time of the

28   Advertisement.  *See* Proposed Pretrial Conference Order, Admitted Fact No. 15;

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

CV10-3790-AHM (JCx)       - 17 -       HUJ'S TRIAL BRIEF
TECH/1181056.1

1    Testimony of Beth Doxtader-Dumas and Tr. Exh. 77.  Moreover, by distributing the

2    Advertisement and selling the Terrain within California, GM was operating within

3    its borders for purposes of the statute.  *See Downing v. Abercrombie & Fitch*, 265

4    F.3d 994, 1007 (9th Cir. 2001).

5    **V.    THE COURT SHOULD DISMISS GM'S LONE DEFENSE**

6    **BEFORE TRIAL**

7    It is appropriate to immediately dismiss GM's defense under *Comedy III* and

8    avoid the unnecessary testimony and discussion of related exhibits that GM is

9    planning to introduce at trial.

10   The Advertisement is commercial speech, not a work of art, satire or parody.

11   *Comedy III Prods., Inc. v. Saderup, Inc.*, 25 Cal.4th 387 (2001) ("*Comedy III*").

12   GM's First Amendment based "transformative test" defense identified in *Comedy*

13   *III* does not apply to the Advertisement because it is limited to a situation, not

14   present in this action, requiring the balancing of a celebrity's right of publicity and

15   the heightened First Amendment interests at stake in the context of non-commercial

16   speech, such as that found in entertainment, creative works of art, literature, satire,

17   etc.

18   In each instance in which a defendant has sought to utilize *Comedy III*'s

19   "transformative test" in the context of a commercial advertisement, the courts have

20   rejected the defense.  *See Ansel Adams Pub. Rights Trust v. PRS Media Partners,*

21   *LLC*, 2010 WL 4974114, at *4 (N.D. Cal. Dec. 1, 2010)("Defendant's use of the

22   Ansel Adams name and likeness [on posters and prints] was use for purely

23   commercial purposes – to market and sell 'Ansel Adams' prints and posters.  Based

24   on the Trust's allegations, the First Amendment does not bar its right of publicity

25   claim"); *Butkus v. Downtown Athletic Club of Orlando, Inc.*, 2008 WL 2557427, at

26   *10 (C.D. Cal. April 2, 2008)(use of former football player's name to promote

27   award handed out by athletic club was "not entitled to First Amendment protection"

28   because it created "the false impression that Butkus continues to endorse [the

1  club's] presentation of the award"); *Presley v. Grant*, 2002 WL 31547000, at *8

2  (Cal. Ct. App. Nov. 18, 2002)(holding that defendant's use of celebrity's name and

3  image in promotional advertisements for its book "were commercial speech, not

4  entitled to First Amendment protection"). Based upon the foregoing, GM's

5  Comedy III "transformative use" defense should be dismissed as a matter of law.

6      In addition, even if it was appropriate to evaluate the Advertisement in the

7  context of GM's alleged First Amendment "transformative use" defense, it would

8  not be applicable. The Court may examine the Advertisement and the photograph

9  from which it was created and observe, as a matter of law, that there is no

10  transformation of Dr. Einstein's image giving it a new expression, meaning or

11  message, and that the value of the Advertisement results primarily from the use of

12  Dr. Einstein's face. *See Winter v. DC Comics,* 30 Cal. 4th 881, 891 (2003) ("As in

13  *Comedy III* … courts can often resolve the question as a matter of law simply by

14  viewing the work in question and, if necessary, comparing it to an actual likeness of

15  the person or persons portrayed.").

16  **VI.  CONCLUSION**

17      The Hebrew University of Jerusalem respectfully requests that the Court

18  confirm its ownership of Dr. Einstein's post mortem rights of publicity under both

19  the New Jersey common law and California Civil Code §3344.1(b) and (2) submit

20  its Third and Fourth Claims for relief to the jury to determine GM's infringement of

21  the University's ownership of Dr. Einstein's post mortem rights of publicity.

22  Dated: August 28, 2012       **ARENT FOX LLP**
                                  ROBERT C. O'BRIEN
23                                DAVID G. BAYLES

24                                By: _____/David G. Bayles/_____
25                                      David G. Bayles
                                        Attorneys for Plaintiff
26                                      THE HEBREW UNIVERSITY OF JERUSALEM

27

28