KELLI L. SAGER (SBN 120162)
 kellisager@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 S. Figueroa Street, Suite 2400
Los Angeles, California 90017-2566
Telephone:  (213) 633-6800
Facsimile:  (213) 633-6899

STEPHEN M. RUMMAGE (admitted *pro hac* vice)
Email steverummage@dwt.com
AMBIKA K. DORAN (admitted *pro hac vice*)
Email ambikadoran@dwt.com
DAVIS WRIGHT TREMAINE LLP
1201 Third Avenue, Suite 2200
Seattle, Washington 98101
Telephone:  (206) 757-8136
Facsimile:  (206) 757-7136

Attorneys for General Motors LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE HEBREW UNIVERSITY OF JERUSALEM,<br><br>                              Plaintiff,<br><br>           vs.<br><br>GENERAL MOTORS LLC,<br><br>                              Defendant. | Case No. **CV10-3790-AHM (JCx)**<br><br>**GM'S SUPPLEMENTAL AUTHORITY ON: (A) "DURATION" [DKT. 157] AND (B) DISPUTED INSTRUCTIONS 213, 303 [DKT. 161]**<br><br>Trial Date:  September 11, 2012<br>Time:  8:30 a.m.<br>Courtroom:  14 |

        Defendant General Motors LLC submits as supplemental authority the Ninth

Circuit's opinion in *Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC,* -- F.3d

--, Nos. 08-56471, 08-56472 & 08-56552 (9th Cir. Aug. 30, 2012) (attached).  In

*Milton H. Greene*, Marilyn Monroe LLC claimed it succeeded to Marilyn Monroe's

publicity rights.  The Ninth Circuit, however, affirmed a decision of United States

District Judge Margaret M. Morrow holding Ms. Monroe was domiciled in New

York when she died and therefore had no post-mortem publicity rights to convey.

                              1

The decision in *Milton H. Greene* relates to pending issues in two ways:

**First**, the decision highlights a factor this Court should consider in deciding the duration of post-mortem publicity rights.  The Ninth Circuit noted that, by claiming post-mortem publicity rights, Monroe LLC had forced photographers of Ms. Monroe into "lengthy litigation … to simply defend their right to profit from their copyrighted photographs."  Slip op. at 10236.  It observed that "[i]f Monroe LLC were to succeed in establishing ownership of Monroe's right of publicity, Milton Greene's ability to commercially exploit the photographs that it created and in which it owns copyrights would be subject to Monroe LLC's control."  *Id.*

Society has an interest (reflected in the Constitution's Copyright Clause, Art. 1, § 8, cl. 8) in allowing artists, including photographers, to exploit their creations.  *See* GM's Resp. to HUJ's Statement on Duration [Dkt. 157] at 6:4-17 (discussing balancing of interests in determining duration of post-mortem rights).  The longer a post-mortem publicity right lasts, the longer artists are constrained from exploiting their work free of restrictions imposed by dead subjects—as *Milton H. Greene* notes.

**Second**, *Milton H. Greene* bears on HUJ's request for jury instructions that would find, as a matter of law, that Dr. Einstein's image had "commercial value" in 1955.  *See* Jt. Statement on Instrs. [Dkt. 161] at 4-6, 12-3 (Instrs. 213 & 303).  The Court's decision turns on representations that Ms. Monroe's estate made to taxing authorities and courts that she was domiciled in New York, not California, to obtain favorable tax treatment and avoid claims.  Slip op. at 10234-35.  The Court held Monroe LLC could not repudiate those representations to take advantage of California's post-mortem right of publicity statute.  *Id.* at 10236.

Similar principles apply to HUJ, which cannot recover under the California statute unless it shows Dr. Einstein's publicity rights had "commercial value" when he died in 1955.  *See* Cal. Civ. Code §3344.1(h).  (Of course, GM contends HUJ cannot assert a California statutory claim ***at all*** under the single-publication rule.  *See*

2

GM's Trial Brief [Dkt. 177] at 2-4.)  Dr. Einstein's estate (like Ms. Monroe's estate) made assertions inconsistent with its current position:  it did not tell tax authorities the Trust included commercially valuable publicity rights; instead, it reported the Trust included only "copyrights, royalties, and other literary properties," and it allocated no value to anything resembling publicity rights.  Aff. of Otto Nathan (Tr. Ex. 38) at 10 ¶ 19; Albert Einstein Estate Account (Tr. Ex. 37), Sch. H.

Under *Milton H. Greene*, GM should have the right to present this evidence to the jury and argue that (a) the estate accountings admit that Dr. Einstein's publicity rights had no commercial value in 1955 and (b) HUJ therefore has not met its burden of showing commercial value.  *Milton H. Greene* provides yet another reason why the Court should refuse to give HUJ's proposed Instructions 213 and 303.

DATED: August 31, 2012      DAVIS WRIGHT TREMAINE LLP
                            KELLI L. SAGER
                            STEPHEN M. RUMMAGE
                            AMBIKA K. DORAN

                            By: /s/ Stephen M. Rummage
                                Stephen M. Rummage
                                Attorneys for General Motors LLC

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit A

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MILTON H. GREENE ARCHIVES, INC.,
*Plaintiff-Appellee,*

v.

MARILYN MONROE LLC, a
Delaware Limited Liability
Company; ANNA STRASBERG, an
individual,
*Defendants-Appellants,*

and

CMG WORLDWIDE INC., an Indiana
Corporation,
*Defendants.*

No. 08-56471

D.C. No.
2:05-cv-02200-
MMM-E

MILTON H. GREENE ARCHIVES, INC.,
*Plaintiff-Appellee,*

v.

CMG WORLDWIDE INC., an Indiana
Corporation,
*Defendant-Appellant,*

and

MARILYN MONROE LLC, a
Delaware Limited Liability
Company; ANNA STRASBERG, an
individual,
*Defendants.*

No. 08-56472

D.C. No.
2:05-cv-02200-
MMM-E

10208        GREENE ARCHIVES V. MARILYN MONROE

THE MILTON H. GREENE ARCHIVES, INC.,

     *Plaintiff-counter-defendant-Appellant,*

TOM KELLEY STUDIOS, INC.,

     *Defendant-counter-plaintiff-Appellant,*

v.

CMG WORLDWIDE INC., an Indiana Corporation; MARILYN MONROE LLC, a Delaware Limited Liability Company; ANNA STRASBERG, an individual,

     *Defendants-counter-plaintiffs-Appellees.*

No. 08-56552

D.C. No.
2:05-cv-02200-MMM-E

OPINION

Appeal from the United States District Court
for the Central District of California
Margaret M. Morrow, District Judge, Presiding

Argued and Submitted
October 13, 2011—Pasadena, California

Filed August 30, 2012

Before: Alfred T. Goodwin and Kim McLane Wardlaw,
Circuit Judges, and William K. Sessions III,
District Judge.*

Opinion by Judge Wardlaw

*The Honorable William K. Sessions III, District Judge, United States District Court for Vermont, sitting by designation.

## COUNSEL

Douglas E. Mirell, Laura A. Wytsma and Benjamin R. King, Loeb & Loeb LLP, Los Angeles, California for appellants and cross-appellees Anna Strasberg and Marilyn Monroe LLC.

Theodore J. Minch, Sovich Minch LLP, McCordsville, Indiana, and William Weinberger, Parker, Milliken, Clark, O'Hara & Samuelian, Los Angeles, California for appellant and cross-appellee, CMG Worldwide, Inc.

Surjit P. Soni, Leo E. Lundberg, Jr. and M. Danton Richardson, The Soni Law Firm, Pasadena, California for appellees and cross-appellants The Milton Green Archives, Inc. and Tom Kelley Studios, Inc.

---

## OPINION

WARDLAW, Circuit Judge:

   An enduring American celebrity, Marilyn Monroe continues to inspire both admiration and litigation a half-century after her death.[1] At issue is whether appellants inherited a

---

[1] Just within the past year, Monroe was the subject of both a major motion picture, *My Week with Marilyn*, and a network television series, *Smash*. Numerous books tell and retell her life story and hypothesize about her death. Several new books were released to coincide with the fiftieth anniversary of her death, and a Westlaw search yields 153 articles about Monroe that were published on the day of the anniversary of her death. Hip hop artist Nicki Minaj sings about her. *See* Nicki Minaj, *Marilyn Monroe*, *on* Pink Friday: Roman Reloaded (Universal Republic Records 2012). Plans have been announced for Monroe-themed cafes and nail salons. *See* Maureen Dowd, *The Love Goddess Who Keeps Right on Seducing*, N.Y. Times, Aug. 5, 2012. And in the wake of deceased rapper Tupac's recent performance at the Coachella Valley Music and Arts Festival, there are even plans to resurrect Monroe as a holographic "performer, spokesperson, cultural pundit and computer avatar." Eriq Gardner, *Holograms: A New Dangerous Frontier*, The Hollywood Reporter, June 8, 2012.

right of publicity, which was created and deemed posthumous by the states of California and Indiana decades after her death, through a residual clause in her Last Will and Testament. The will was subject to probate in the state of New York, which does not recognize a posthumous right of publicity. The issue of appellants' rights turns on whether Monroe was domiciled in California or New York at the time of her death. We conclude that because Monroe's executors consistently represented during the probate proceedings and elsewhere that she was domiciled in New York at her death to avoid payment of California estate taxes, among other things, appellants are judicially estopped from asserting California's posthumous right of publicity. We therefore affirm the district court's order so holding.[2]

## I.

Following her divorce from Arthur Miller, while in New York City, Marilyn Monroe executed her Last Will and Testament on January 14, 1961. She named New York attorney Aaron Frosch executor. She then traveled to California in the spring of 1961, where she first stayed in a hotel, then moved to a rental apartment, and again moved into a home in Brentwood which she purchased in 1962. In April 1962, Monroe began filming *Something's Got to Give* on the 20th Century Fox Studios lot in Los Angeles. Fox fired her during filming in June for repeated absences and tardiness. Monroe was found dead in her Brentwood home on August 5, 1962. She maintained her New York apartment and staff throughout this period.

---

[2]The district court issued a number of orders, culminating in its July 31, 2008, order granting summary judgment in favor of Milton Greene. *See Milton H. Greene Archives, Inc. v. CMG Worldwide, Inc.*, 568 F. Supp. 2d 1152 (C.D. Cal. 2008).

## A.

Consistent with New York law, the New York Surrogate's Court admitted Monroe's will to probate on October 30, 1962. Frosch, who drafted the will, served as the executor of the estate from that time until his death in 1989. The will sets forth several bequests, but does not explicitly address the right of publicity asserted here. Assuming that such a right existed, it could pass, if at all, through only the will's residual clause, which distributed the "rest, residue and remainder" of Monroe's estate as follows:

(a) To MAY REIS the sum of $40,000.00 or 25% of the total remainder of my estate, whichever shall be the lesser.

(b) To DR. MARIANNE KRIS 25% of the balance thereof, to be used by her as set forth in ARTICLE FIFTH (d) of this my Last Will and Testament.

(c) To LEE STRASBERG the entire remaining balance.

May Reis, Monroe's private secretary, inherited the sum of $40,000 because the residual estate was "significantly greater than $160,000." The estate distributed 25% of the remainder to Dr. Marianne Kris, Monroe's psychiatrist, "for the furtherance of the work of such psychiatric institutions or groups as she shall elect." Kris passed away in 1980, bequeathing her interest in the Monroe estate to the Hampstead Child-Therapy Clinic of London, England (now the Anna Freud Center for the Psychoanalytic Study and Treatment of Children). Frosch apportioned 75% of the remainder of the estate to Lee Strasberg, Monroe's acting coach and close friend. Lee Strasberg died testate in 1982, leaving his share of Monroe's estate to his wife, Anna Strasberg. Following Frosch's death in 1989, the Surrogate's Court appointed Anna Strasberg executor of

the Monroe estate. In 2001, the Surrogate's Court decreed the estate settled and authorized the estate to transfer all remaining assets to Marilyn Monroe LLC ("Monroe LLC"), a newly-formed Delaware Limited Liability Company, managed by Anna Strasberg. Anna Strasberg and the Anna Freud Center are the only members of Marilyn Monroe LLC, holding 75% and 25% membership interests, respectively.

## B.

During the forty-year probate proceedings, Frosch, in his capacity as executor of the estate, consistently represented in numerous judicial and quasi-judicial settings that Monroe was domiciled in New York when she died.[3] In New York, Frosch (and later Anna Strasberg) represented to the Surrogate's Court that Monroe died a domiciliary of New York. In California, Frosch also represented to the California tax authorities that Monroe died a domiciliary of New York.

Because Monroe owned property in California when she died, her estate, represented by the California law firm of Gang, Tyre, Rudin & Brown, initiated ancillary probate proceedings in Los Angeles Superior Court. Frosch successfully avoided substantial California estate taxes by proving that Monroe was a domiciliary of New York. On behalf of the Monroe estate, he sought a "no tax certificate" from the Inheritance Tax Appraiser. The Tax Appraiser required additional substantiation of Monroe's New York domicile to accept California counsel's representation that she died a non-California resident. On April 24, 1964, Hermione Brown, the estate's California counsel, wrote Frosch seeking "information to counteract the fact that Miss Monroe owned a home and actu-

---

[3]Frosch used the term "residence" in his representations about Monroe's domicile. Under California's inheritance laws, residence and domicile are synonymous. *See* Cal. Code Regs. tit. 18, § 13303.4 (formerly Cal. Code Regs. tit. 18, § 640 (1945)) ("For the purpose of the Inheritance Tax Law the term 'residence' is synonymous with legal residence or domicile.").

ally was living in California at the time of her death, and that her mother is physically in California." Brown further advised Frosch that it was important that he answer all the questions in the "Affidavit Concerning Residence," and "in doing so build as strong a case as possible."

Frosch provided Brown with a completed Affidavit Concerning Residence, and supporting affidavits from four Monroe intimates. Brown, in turn, sent the affidavits to the Inheritance Tax Appraiser, representing that "Miss Monroe was a non-resident of the State of California at the time of her death" in a letter dated March 4, 1966. In the Affidavit Concerning Residence, Frosch represented that Monroe filed her last income tax return in New York City, New York in April 1962, and that she purchased her home "in Los Angeles to live at while engaged in performing services in a motion picture film." To the next question, which asked where she was "actually living at the time of her death," Frosch declared that Monroe was "[r]esiding temporarily in Los Angeles while performing as aforesaid," and that she "had a fully furnished apartment in New York City, which was her permanent residence." Frosch explained that Monroe resided "temporarily in California performing services as a motion picture actress . . . for approximately six months prior to death." In response to a question about Monroe's business interests outside of California, Frosch attested that she was "[a]ctive as principal, sole shareholder and officer and director in Marilyn Monroe Productions, Inc., A New York Corporation with offices in New York City."

In response to questions about any statements or acts by Monroe indicating her intended residence, Frosch elaborated that Monroe's actions before her death showed that she intended to remain a resident of New York. He represented that Monroe: "in all respects retained her New York Residence. Said residence was not sublet. It remained fully furnished and contained Decedent's personal effects, clothing, and substantially all of its contents. Furthermore Decedent's

maid continued to look after and maintain said residence." Finally, Frosch represented that on a number of occasions, Monroe told Ralph L. Roberts and May Reis that she "was returning to New York after completing [her] motion picture commitment — that she considered N.Y. her residence." Frosch attached affidavits from Ralph L. Roberts, Hattie Amos, May Reis and Patricia Newcomb recounting statements by Monroe that indicated her intent to remain a New York resident.

In Roberts's affidavit, he attested that he and Monroe had been "close personal friends" since 1955, and that from April 1962 "until her death, [he] spoke to her on an average of at least once each day and had personal meetings with her on an average of at least three times a week."[4] According to Roberts, Monroe purchased the Brentwood home

> primarily for the reason that she disliked living in hotels and preferred both the comfort and privacy of a private home. She indicated that her California house would be used only on such occasions when she was in California performing in a motion picture film or otherwise engaged in similar activities.

He explained that in several conversations shortly before her death, Monroe "specifically told [him] that she intended vacating her California house and was going to return to her New York apartment which she considered her permanent home and residence and to reside permanently thereat."

The Hattie Amos affidavit identified her as Monroe's personal housekeeper for four years before her death. Amos declared that Monroe instructed her "to be at her said New

---

[4]Although his affidavit does not so state, Roberts is widely reported to have been Monroe's personal masseur, close friend and confidant. *See* Lois Banner, *Marilyn: The Passion and the Paradox* 57 (2012); Keith Badman, *Marilyn: The Final Years* 157 (2012).

York City apartment every day while she was temporarily away, and to clean said apartment and perform all of the same functions that [Amos] had been performing while she had been in residence thereat." Monroe told Amos "on several occasions that she considered her said New York apartment as her permanent residence and told [Amos] that her said New York apartment was her permanent home." Amos knew "for a fact that [Monroe] intended returning to her permanent residence in New York." She recounted that, approximately two days before Monroe's death, Monroe requested that Amos "proceed to her California house to stay with her for approximately one month and then . . . return back to New York with decedent."

Reis, Monroe's private secretary from 1958 to 1961 and a beneficiary of her will, declared that:

> When decedent was required to leave New York for the purpose of appearing in a motion picture film, it was generally her practice and custom to temporarily depart from her New York apartment approximately two to three weeks prior to the commencement of the motion picture film. . . . Generally she would remain away from her New York residence until after the completion of the film and any consultations thereafter required. She would then return to her permanent residence in New York.

It was always Reis's understanding that "subsequent to decedent's divorce and while [Reis] was employed by decedent, she considered her said New York apartment as her official and permanent residence."

Patricia Newcomb, a close personal friend who served as Monroe's Public Relations Counsel, attested that Monroe usually stayed in hotels while in California making films. Monroe "advised [Newcomb] at the time she purchased the [Brentwood house], that she acquired same solely for the reason that

she disliked living in hotels, and that she desired and preferred the privacy of living in a private home, even though it was a temporary residence." Newcomb further stated that Monroe "had no intention of making her permanent residence in her said California house, but intended leaving California and returning to her New York residence upon the completion of her assignment in [*Something's Got to Give*]." Newcomb explained that "[a]t the time of her death, [Monroe] was still living in California because the said film had not as yet been completed, and she was awaiting resolution of certain controversies relating thereto." Monroe told Newcomb "that she intended to return to her New York residence for the reasons, among others, that her closest personal friends resided in New York, and that she wished to continue her permanent activities at the Actors Studio, which activities she considered most important to her, and with which project she was closely affiliated with her close personal friends, Mr. and Mrs. Lee Strasberg."

On April 5, 1967, the Inheritance Tax Appraiser reported to the Los Angeles County Superior Court that Monroe had died a resident of the County of New York, State of New York. Although this conclusion exempted substantially all of Monroe's assets from California taxes, a small portion of her estate remained taxable under California law. The estate paid a total of $777.63 in California inheritance taxes.

Monroe's estate also received a stream of royalties from profit participation agreements for motion pictures in which Monroe had appeared. *See Milton H. Greene*, 568 F. Supp. 2d at 1186-88. This income in California led to additional assertions by the estate, separate and apart from those made in the probate proceedings, that Monroe died a domiciliary of New York. In 1971, the California Franchise Tax Board found that the estate owed income taxes on a portion of Monroe's profit participation for the films *Some Like It Hot* and *The Misfits*. Frosch paid income taxes for the estate on the participation income in New York, but took the position with the Franchise

Tax Board that no California income tax was owed because the estate was a resident of New York, not California. Frosch appealed the tax decision to the California State Board of Equalization, which, on April 22, 1975, found the estate liable for $51,243 in past due California income taxes and $12,810 in penalties. The Board also concluded that, because Monroe and the estate were residents of New York, the estate was not entitled to any credit for taxes paid in New York.

Until recently, Anna Strasberg also represented in judicial proceedings on behalf of the estate that Marilyn Monroe died domiciled in New York. For example, in 1992, Nancy Miracle sued Anna Strasberg as the executor of the Monroe estate in the federal district court for the District of Hawaii, claiming that she was Monroe's biological child and seeking 50% of the Monroe estate as a pretermitted heir under California law.[5] Strasberg moved to dismiss the complaint for failure to state a claim and for lack of personal jurisdiction, arguing that New York law applied because "the decedent's domicile at the time of death determines what law will be applied," and that it was undisputed that Monroe "was a New York domiciliary at the time of her death." Agreeing with Strasberg, the district court determined that New York, and not California, law applied to Miracle's pretermitted heir claims. This distinction was "critical" because "under the California law in effect at Monroe's death, pretermitted children could bring claims even if [, like Miracle,] they were born prior to execution of a will, while under the relevant New York law, claims could be brought only by 'after-born children.' " Because New York law applied, the district court held that Miracle failed to state

---

[5]A pretermitted heir is a child or spouse omitted from a will, most commonly when the marriage or birth of the child postdates the execution of the will. *See* Black's Law Dictionary 792 (9th ed. 1999). Many states provide that, unless intentionally omitted, a pretermitted heir receives the share of the estate they would have received if the testator had died intestate. *See, e.g.*, Cal. Prob. Code §§ 21620-23; N.Y. Est. Powers & Trusts Law § 5-3.2.

a claim.[6] In 2002, Miracle petitioned the New York Surrogate's Court to reopen and vacate its orders in the probate of the Monroe estate. Strasberg, on behalf of the estate, argued that the claims were foreclosed under New York law and that the Hawaii court's decision to apply New York law precluded Miracle's claims under the doctrine of res judicata. The Surrogate's Court ultimately applied New York law and dismissed the petition on the merits.

## C.

In March 2005, Marilyn Monroe LLC and its licensee, CMG Worldwide, Inc., sued Milton Greene Archives, Inc. and Tom Kelley Studios, Inc. (collectively, "Milton Greene")[7] in the federal district court for the Southern District of Indiana, claiming ownership of Marilyn Monroe's right of publicity and alleging that Milton Greene was violating Monroe LLC's rights by using Monroe's image and likeness for unauthorized commercial purposes, including the advertising and sale of photographs of Monroe. Shortly thereafter, Milton Greene sued CMG Worldwide, Monroe LLC and Anna Strasberg in the federal district court for the Central District of California, seeking a declaration that Monroe LLC does not own Monroe's right of publicity. Although Anna Strasberg is named as a defendant in her personal capacity, she does not assert that she owns Monroe's right of publicity other than through her interest in Monroe LLC. The Indiana cases were transferred to the Central District of California and consolidated with the California cases. In addition to the dueling

---

[6]The Hawaii district court dismissed the case both for failure to state a claim and for lack of personal jurisdiction. A district court may decide that a complaint fails to state a claim even when it does not have personal jurisdiction. *See Wages v. I.R.S.*, 915 F.2d 1230, 1234-35 (9th Cir. 1990) (discussing a court's authority to address alternate bases for dismissal when it finds a lack of personal jurisdiction, as opposed to when it finds a lack of subject matter jurisdiction).

[7]Milton Greene and Tom Kelley were well known photographers whose bodies of work include collections of Monroe photographs.

declaratory relief claims about Monroe's right of publicity, each of the complaints asserted numerous other claims, including business torts and violations of the Copyright and Lanham Acts. In the course of the litigation, the parties dismissed all claims other than those alleging violations of Monroe's right of publicity and those seeking declaratory relief regarding Monroe LLC's claim to own that right.[8]

On May 14, 2007, the district court granted summary judgment in favor of Milton Greene, holding that Monroe LLC did not own Monroe's right of publicity. The court concluded that, at the time of Monroe's death in 1962, the states of New York, California and Indiana did not recognize "a descendable, posthumous right of publicity." Acknowledging that "California created a descendable, posthumous right of publicity in 1984, with the passage of its post-mortem right of publicity statute,"[9] the district court held that as of 1962, applying either New York or California law, no right of publicity could have passed through Monroe's will, reasoning that Monroe "had no testamentary capacity to devise, through the residual clause of her will, statutory rights of publicity that were not created until decades after her death." The district court granted summary judgment in favor of Milton Greene,

---

[8]We deny Milton Greene's request to take judicial notice of appeals pending in the Second Circuit in cases related to *Shaw Family Archives, Ltd. v. CMG Worldwide, Inc.*, 589 F. Supp. 2d 331 (S.D.N.Y. 2008). Although those cases also involve claims about the ownership of Marilyn Monroe's right of publicity, the issues on appeal bear no relation to the claims at issue here. *See* Fed. R. Evid. 201; *United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) ("[W]e may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue.") (quotation marks omitted).

[9]Before the passage of Civil Code § 3344.1, which created the posthumous right of publicity, California courts had held that a celebrity's right of publicity terminated upon the individual's death. *See Lugosi v. Universal Pictures*, 25 Cal. 3d 813 (1979). As enacted in 1984, Civil Code § 3344.1 did not address whether it was intended to have retroactive effect.

concluding that, because Monroe LLC was not entitled to exercise Monroe's posthumous right of publicity, it lacked standing to assert those rights against Milton Greene.

On June 28, 2007, in direct response to the district court's grant of summary judgment, California State Senator Sheila Kuehl introduced Senate Bill 771 ("SB 771"), which, when enacted in early September 2007, amended California Civil Code § 3344.1.[10] The bill states:

> It is the intent of the Legislature to abrogate the sum-mary judgment orders entered in *The Milton H. Greene Archives, Inc. v. CMG Worldwide, Inc.*, United States District Court, Central District of California, Case No. CV 05-2200 MMM (MCx), filed May 14, 2007, and in *Shaw Family Archives Ltd. v. CMG Worldwide, Inc.*, United States District Court, Southern District of New York, Case No. 05 Civ. 3939 (CM), dated May 2, 2007.[11]

SB 771 amended Civil Code § 3344.1 to provide that the California statutory right of publicity is deemed to have existed at the time of death of any deceased personality who died before January 1, 1985; is a property right, freely transferable and descendible; and, in the absence of an express testamentary transfer, could pass through the residual clause in the will of the deceased personality.

---

[10]In her formative years, Senator Kuehl was a child actor, best known for her role as Zelda Gilroy in the television series *The Many Loves of Dobie Gillis*. Kuehl originally introduced SB 771 on February 23, 2007 as a stem cell research law, but then revised it in June to make it an amend-ment to Civil Code § 3344.1.

[11]In *Shaw Family Archives*, the district court for the Southern District of New York held, like the district court here, that before the 2007 amend-ment, Civil Code § 3344.1 did not retroactively allow deceased personali-ties like Monroe to transfer the statutory right of publicity through a will. 486 F. Supp. 2d at 319-20. Briefing in the appeal from that decision to the Second Circuit was stayed pending the outcome of this appeal.

Based on the passage of SB 771, Monroe LLC sought reconsideration of the district court's grant of summary judgment for Milton Greene. Granting the motion for reconsideration, the district court held that SB 771 applied retroactively and that Civil Code § 3344.1, as amended, permitted Monroe's right of publicity to pass to Monroe LLC through the residual clause of her will, if California's substantive right of publicity law applied. Unlike the California legislature, the New York legislature had rejected Monroe LLC's efforts to amend its laws to enact a similar descendible, posthumous right of publicity. Therefore, if New York law applied—which it would if Monroe was domiciled in New York at the time of her death—Monroe's right of publicity would have been extinguished at her death. Addressing the questions of domicile and choice of law, the district court again granted summary judgment to Milton Greene, reasoning that principles of judicial estoppel precluded Monroe LLC from advocating that Monroe was domiciled in California when she died.

## II.

We review a district court's order granting summary judgment de novo. *See Bamonte v. City of Mesa*, 598 F.3d 1217, 1220 (9th Cir. 2010). We view the evidence in the light most favorable to the nonmoving party on each issue and determine whether the district court correctly applied the relevant substantive law. *Id.* We also review a district court's interpretation of a statute de novo. *Beeman v. TDI Managed Care Servs., Inc.*, 449 F.3d 1035, 1038 (9th Cir. 2006). We may affirm a district court's judgment on any basis supported by the record. *Id.*

Federal law governs the application of judicial estoppel in federal courts, and a district court's application of judicial estoppel is reviewed for abuse of discretion. *Johnson v. Oregon*, 141 F.3d 1361, 1364 (9th Cir. 1998). We apply a two-part test to determine whether a district court has abused its

discretion. *See Associated Press v. Otter*, 682 F.3d 821, 824 (9th Cir. 2012). First, we determine de novo whether the trial court identified the correct legal rule to apply to the relief requested. *Id.* If the trial court identified the correct legal rule, we then evaluate whether the trial court's application of the correct legal standard was (1) "illogical," (2) "implausible," or (3) "without support in inferences that may be drawn from the facts in the record." *Id.* (quotation marks omitted).

## III.

**[1]** Monroe LLC now asserts that Monroe died domiciled in California, not New York, and contends that the district court improperly extended the doctrine of judicial estoppel to preclude litigation of the question of Monroe's domicile at death.[12] "[J]udicial estoppel, 'generally prevents a party from

---

[12]CMG Worldwide separately appeals the district court's grant of summary judgment on its Indiana state law claims. It asserts that Indiana's 1994 Right of Publicity Act, Ind. Code §§ 32-36-1-1 to -20, posthumously vested Monroe's estate and, hence, Monroe LLC with Monroe's right of publicity. Indiana choice-of-law rules dictate that in resolving these state law claims we must apply the law of Monroe's domicile, New York, as controlling on all substantive matters related to the estate and disposition of property. *See Maurice F. Jones Trust v. Barnett Banks Trust Co.*, 637 N.E.2d 1301, 1304 (Ind. App. 1994) (citing *Lovett v. Lovett*, 155 N.E. 528, 530 (Ind. App. 1927)). In New York, a will can dispose only of property owned at the time of death. *See In re Van Winkle's Will*, 86 N.Y.S. 2d 597, 600 (N.Y. Sur. 1949) ("Of course, under no circumstances, in the absence of a valid power, can any amount of testamentary intent produce the effect of subjecting property not owned by a testator at the date of his death to any disposition whatever."). Because no descendible right of publicity existed in New York in 1962, Monroe's right of publicity was extinguished at her death, and did not become a part of her estate. Therefore, the district court correctly granted summary judgment in favor of Milton Greene on the Indiana state law claims. Because we hold that Monroe LLC is judicially estopped from asserting that Monroe died a domiciliary of California, we need not, and do not, address the various other rulings sought by the parties on the validity, meaning, scope and constitutionality of California's and Indiana's right of publicity laws. *Cf. Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 341-49 (1936) (Brandeis, J., concurring).

prevailing in one phase of a case on an argument and then
relying on a contradictory argument to prevail in another
phase.' " *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)
(quoting *Pegram v. Herdrich*, 530 U.S. 211, 227 n.8 (2000)).
It is an equitable doctrine invoked "not only to prevent a party
from gaining an advantage by taking inconsistent positions,
but also because of 'general considerations of the orderly
administration of justice and regard for the dignity of judicial
proceedings,' and to 'protect against a litigant playing fast and
loose with the courts.' " *Hamilton v. State Farm Fire & Cas.
Co.*, 270 F.3d 778, 782 (9th Cir. 2001) (quoting *Russell v.
Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990)) (alteration omit-
ted). Some commentators have suggested, however, that judi-
cial estoppel "is not so much a single doctrine as a set of
doctrines that have not matured into a fully coherent theory."
18B Wright & Miller, *Fed. Prac. & Proc. Juris.* § 4477 (2d
ed. 2012).[13]

[2] The Supreme Court has provided little guidance on the
contours of judicial estoppel. It has acknowledged that cir-
cumstances where the doctrine may apply "are probably not
reducible to any general formulation." *New Hampshire*, 532
U.S. at 750. In *New Hampshire*, however, the Court identified
three factors that courts should consider in determining
whether the doctrine is applicable in a given case:

> First, a party's later position must be clearly incon-
> sistent with its earlier position. Second, courts regu-
> larly inquire whether the party has succeeded in
> persuading a court to accept that party's earlier posi-

---

[13]A party can be estopped by statements successfully advanced in both
judicial and administrative proceedings. *Rissetto v. Plumbers and Steam-
fitters Local 343*, 94 F.3d 597, 604 (9th Cir. 1996). California inheritance
tax appraisers are appointed by the courts and act in a quasi-judicial capac-
ity. *See Greenaway v. Workmen's Comp. Appeals Bd.*, 269 Cal. App. 2d
49, 54 (1969). And the California State Board of Equalization "is a consti-
tutional agency that exercises quasi-judicial powers." *EHP Glendale v.
Cnty. of Los Angeles*, 193 Cal. App. 4th 262, 274 (2011).

> tion, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled. . . . A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*Id.* at 750-51 (citations and quotations omitted). In precedent that predates *New Hampshire*, we have held that the doctrine of judicial estoppel applies "when a party's position is tantamount to a knowing misrepresentation to or even fraud on the court." *Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 235 F.3d 1184, 1190 (9th Cir. 2000) (quoting *Johnson*, 141 F.3d at 1369 (quoting *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362-63 (3d Cir. 1996))).

## A.

Relying on *Wyler Summit*, 235 F.3d at 1190, Monroe LLC contends that we must find "a knowing antecedent misrepresentation by the person or party alleged to be estopped," and that the district court erred when it held that Frosch's now-disavowed statements about Monroe's domicile were knowing misrepresentations. It is unclear when Monroe LLC decided that Frosch's position was so fraught with error, since the Monroe estate continued to make the same representations about Monroe's domicile as Frosch did well past the latter's demise.

In *Wyler Summit*, we explained that "[i]f a litigant's current position is manifestly inconsistent with a prior position such as to amount to an affront to the court, judicial estoppel may apply." *Id.* (quotation marks omitted). There, the plaintiff was owed $1.5 million in profit participation payments under a 1958 contract for William Wyler to direct the film *Ben Hur*. *Id.* at 1188-89. The Wyler contract called for $50,000 annual payments of profit participation proceeds, but in 1995,

Wyler's successor in interest sought to waive the annual payment term and collect the remaining funds in a lump sum. *Id.* at 1189. The district court held that "because Mr. Wyler claimed only $50,000 per year in percentage compensation when declaring his taxable income to the I.R.S., he was judicially estopped from claiming the right to waive the provision" and collect the remaining balance due to him as a lump sum. *Id.* at 1190. We reversed the district court's ruling because Wyler's representations to the I.R.S. about the money he received each preceding year were accurate; there was no inconsistency in his positions with the I.R.S. and the district court, let alone a knowing misrepresentation. *Id.*

In *Johnson*, a case cited and relied upon by *Wyler Summit*, we explained that, "[i]f incompatible positions are based not on chicanery, but only on inadvertence or mistake, judicial estoppel does not apply." 141 F.3d at 1369. There, we reversed a magistrate judge's application of judicial estoppel against a plaintiff suing for disability discrimination. *Id.* at 1363-64. Before filing her disability suit, Johnson represented that she was disabled in applications for benefits from her insurance company and from the Social Security Administration. *Id.* at 1364-65. She also wrote a letter to the I.R.S. explaining her inability to work and that her disabilities caused her to file her 1992 tax return late. *Id.* at 1365. The magistrate judge held that, because of those statements, Johnson was estopped from asserting that she was "capable of performing the essential functions of her job" under the Americans with Disabilities Act. *Id.* at 1366. Johnson's representations to her insurance company and the Social Security Administration, however, were not actually inconsistent with the claims in her disability suit, and her statements to the I.R.S. were made only in the context of seeking leniency for a late return, and not in a proceeding adjudicating a claim of disability. *Id.* at 1370-71. We explained that her representations were evidence to be weighed in evaluating her discrimination claim, but that they were not "so inconsistent that they amount to an affront to the court." *Id.* at 1369.

The Supreme Court has instructed that there are no "inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel." *New Hampshire*, 532 U.S. at 751. "[W]here the reasoning or theory of our prior circuit authority is clearly irreconcilable with the reasoning or theory of intervening higher authority, a three-judge panel should consider itself bound by the later and controlling authority, and should reject the prior circuit opinion as having been effectively overruled." *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc). Our decisions in *Wyler Summit* and *Johnson* are largely harmonizable with the Supreme Court's in *New Hampshire*: In *Wyler Summit* we held that there was no judicial estoppel because there was no inconsistency at all in the positions asserted; and in *Johnson*, we held that a minor inconsistent statement in an ancillary matter was insufficient to justify application of judicial estoppel.

**[3]** However, to the extent that we have suggested, as in *Johnson*, that a showing of chicanery is an "inflexible prerequisite" to judicial estoppel, *Wyler Summit* and *Johnson* are inconsistent with *New Hampshire*. In the wake of *New Hampshire*, we have treated fraud on the court as a factor rather than as a requisite element of the judicial estoppel analysis. *See Samson v. NAMA Holdings, LLC*, 637 F.3d 915, 935 (9th Cir. 2011). We acknowledge that we have also continued to describe judicial estoppel as inapplicable "when a party's prior position was based on inadvertence or mistake." *United States v. Ibrahim*, 522 F.3d 1003, 1009 (9th Cir. 2008) (quoting *Helfand v. Gerson*, 105 F.3d 530, 536 (9th Cir. 1997)). However, in *Ibrahim*, despite discussing and relying in part on the lack of chicanery, we nonetheless applied the *New Hampshire* test to find against a party asserting judicial estoppel. *Id.* at 1009-10. We now clarify that chicanery or knowing misrepresentation by the party to be estopped is a factor to be considered in the judicial estoppel analysis and not an "inflexible prerequisite" to its application.

Although an antecedent knowing misrepresentation is not a prerequisite for judicial estoppel, we do not believe that the

district court erred in finding such a misrepresentation here. Monroe LLC itself makes the case that, at a minimum, Frosch, as the executor of the Monroe estate, made representations and submitted affidavits by others that were "patently inconsistent with the objective, contemporaneous evidence" and "riddled with blatant inaccuracies." Monroe LLC also contends that the affidavits provided by Frosch were "prepared years after Marilyn's death for the express purpose of trying to avoid tax liability at a time when the Monroe Estate was believed to be insolvent." Monroe LLC has repeatedly insinuated that Frosch misrepresented Monroe's true domicile to obtain favorable tax assessments, both as to inheritance and income.

When and why the fact of Monroe's domicile at death changed is unclear. Monroe LLC also suggests that it has always believed that Monroe died domiciled in California, and that Frosch was simply mistaken in his belief and representations because he did not have access to some documents that allegedly contradict the materials and declarations he relied upon. This assertion by Monroe LLC is dubious, at best. Frosch had contemporaneous access to people knowledgeable about Monroe's intentions, including Ralph L. Roberts, her close friend and confidant and reportedly the last person to see her alive. To the extent that there was any debate, Frosch represented, with significant evidentiary support, that Monroe's intention was to remain domiciled in New York, though she temporarily relocated to California for a movie shoot. Another possibility, for which we have insufficient evidence, is that Monroe LLC's present position on Monroe's domicile is a knowing misrepresentation, or tantamount to a fraud on the court. In light of this irreconcilable conflict between diametrically opposed representations about Monroe's intended domicile, the district court's determination that Frosch intentionally misled the courts is supported by "inferences that may be drawn from the facts in the record" and is therefore not an abuse of discretion. *See Otter*, 682 F.3d at 824.

**B.**

[4] Turning to the *New Hampshire* factors, we must first determine whether Monroe LLC has taken clearly inconsistent positions in prior judicial proceedings. Monroe could not have been domiciled in both California and New York at the time of her death. *See Gaudin v. Remis*, 379 F.3d 631, 636 (9th Cir. 2004) ("[S]he may have only one domicile at a time."). Until this litigation, in every prior judicial and quasi-judicial proceeding, the Monroe entities took the position that Monroe died domiciled in New York; Monroe LLC now asserts that Monroe died domiciled in California. These positions are plainly inconsistent. Because judicial estoppel bars only inconsistent positions taken by the same party in two different matters, the question thus becomes whether the successive executors' representations on behalf of the estate that Monroe died a domiciliary of New York are attributable to Monroe LLC.

We apply other estoppel doctrines, like collateral estoppel, "not only against actual parties to prior litigation, but also against a party that is in privity to a party in a previous litigation." *Wash. Mut. Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011). It is well-established that "a non-party may be bound by a judgment if one of the parties to the earlier suit is so closely aligned with the non-party's interests as to be its virtual representative." *Mother's Rest., Inc. v. Mama's Pizza, Inc.*, 723 F.2d 1566, 1572 (Fed. Cir. 1983) (collecting cases). Because the doctrine of judicial estoppel is intended to protect the courts, we are particularly mindful that the "[i]dentity of parties is not a mere matter of form, but of substance. Parties nominally the same may be, in legal effect, different; and parties nominally different may be, in legal effect, the same." *Chicago, Rock Island & Pac. Ry. Co. v. Schendel*, 270 U.S. 611, 620 (1926) (citation omitted).

[5] We have not previously addressed the question of whether privity lies between an executor and the beneficiaries

of an estate. Supreme Court precedent, however, supports the district court's conclusion that, particularly under the circumstances presented here, Frosch is the privy of Monroe LLC. For example, in *Schendel*, the Supreme Court found privity, for the purposes of applying res judicata, between a special administrator for the deceased spouse's estate and the decedent's widow, whom the administrator represented in a lawsuit to recover benefits where the widow was not personally a party. 270 U.S. at 622. The widow was the sole beneficiary of the action filed by the special administrator, who had statutory authority to represent the estate. *Id.* at 620. Because the interests represented by the administrator were substantially identical to those of the widow, the Court concluded that the application of equitable principles deemed the administrator and the widow in privity for res judicata purposes. *See id.* at 620-22. The *Schendel* Court also cited with approval older precedent "that a judgment against a trustee for bondholders was conclusive in a suit involving the same subject-matter, brought by him in his individual character." *Id.* at 621 (citing *Corcoran v. Chesapeake & Ohio Canal Co.*, 94 U.S. 741, 745 (1876)).

[6] Other circuits have also concluded that privity lies between the administrator of an estate and the beneficiaries of that estate. The Second Circuit has held that "[t]he administrator of a decedent's estate is in privity both with the decedent and with the decedent's beneficiaries." *Bender v. City of Rochester*, 765 F.2d 7, 12 (2d Cir. 1985). Similarly, the Seventh Circuit has held that "a trust beneficiary is collaterally estopped by a previous adjudication for or against a trustee, so long as the trustee and beneficiary did not have adverse interests in the conduct of the prior litigation and the trustee was authorized to prosecute and defend litigation on behalf of the trust." *Pelfresne v. Vill. of Williams Bay*, 865 F.2d 877, 881 (7th Cir. 1989).

[7] Because tax and estate matters are generally governed by state law, the laws of California and New York are also

instructive, if not controlling, here. Courts in both California and New York have held that the administrator and the beneficiaries of an estate are in privity for estoppel purposes. In California, it has long been the law that:

> A judgment entered in an action in which an administratrix of an estate of a deceased person is a party, is binding not only upon the administratrix but also upon the heirs of the deceased person, even though the heirs have not been made parties to the action. The rule in this state is that the judgment concludes not only the adverse party but also all those claiming under the title he represents.

*Luckhardt v. Mooradian*, 92 Cal. App. 2d 501, 519 (1949). *See also Spotts v. Hanley*, 85 Cal. 155, 167 (1890) ("The administrator is in privity with and represents both heirs and creditors, and a judgment in ejectment recovered by or against an administrator is an estoppel in favor or against the heir and those claiming under him."). Similarly, under New York state law, the executor of a decedent's estate is a fiduciary of the estate's beneficiaries. *See Knox v. HSBC Bank, USA*, 791 N.Y.S.2d 101, 101 (App. Div. 2005) ("[A]n estate trustee's fiduciary duties to estate beneficiaries persist until the affairs of the estate are finally wound up.").

   The Restatement of Judgments (Second) § 41 (1982), explains that "[a] person who is not a party to an action but who is represented by a party is bound by and entitled to the benefits of a judgment as though he were a party" if the person was represented by the "trustee of an estate or interest of which the person is a beneficiary." Similarly "[a] person represented by a party to an action is bound by the judgment even though the person himself does not have notice of the action, is not served with process, or is not subject to service of process." *Id.* The exception to the general rule against nonparty preclusion was recently reaffirmed by the Supreme Court in *Taylor v. Sturgell*, 553 U.S. 880, 893-95 (2008)

(identifying six "established categories" where nonparties are subject to estoppel). The *Sturgell* Court expressly noted that nonparty "preclusion may be justified based on a variety of pre-existing substantive legal relationships between the person to be bound and a party to the judgment" and when the nonparty was adequately represented in a prior litigation by "trustees, guardians, and other fiduciaries." *Id.* at 894 (quotations and alterations omitted).

[8] Here, Frosch and, later, Anna Strasberg represented the Monroe estate in their capacities as executor. Both Frosch and Strasberg consistently stated in judicial proceedings, from 1962 to at least 2002, that Monroe died domiciled in New York, and not California. There is no dispute that Frosch dealt in a representative and not a personal capacity in his representations to the courts. In the Affidavit Concerning Residence submitted to the Inheritance Tax Appraiser, Frosch stated that his "relationship or representative capacity" was as executor of the Monroe estate. And in the 1971 to 1975 proceedings before the California Franchise Tax Board and the State Board of Equalization, Frosch participated as the executor for the Monroe estate. In those proceedings, as executor, Frosch acted on behalf of the estate and its beneficiaries to minimize exposure to California taxes. Monroe LLC, as beneficiary of the estate, is thus in privity with Frosch. Therefore, the representations made over the years by Frosch are attributable to Monroe LLC for judicial estoppel purposes.

After she became executor, Strasberg continued to assert the position that Monroe died domiciled in New York. As a 75% beneficiary of the residual estate, Strasberg's personal interests are arguably even more closely aligned with those of the estate than Frosch's were. In 1992, Strasberg successfully defended the *Miracle* action filed in the District of Hawaii by representing that Monroe had died domiciled in New York. By asserting that position while representing the Monroe estate, she obtained the benefit of New York law to avoid Miracle's claims under California law. When Miracle later

petitioned the New York Surrogate's Court to reopen and vacate its orders related to the Monroe estate, Strasberg moved to dismiss the petition, asserting that the Hawaii court's holding that New York law governed Monroe's estate because she died a domiciliary of New York was res judicata and barred Miracle's claims. In each of these judicial proceedings, Strasberg, as executor, acted on behalf of the Monroe estate. Moreover, Strasberg's status as a beneficiary of the will and as an owner of Monroe LLC further supports a finding of privity. Strasberg's representations about Monroe's domicile are thus also attributable to Monroe LLC.

Monroe LLC's new litigation position that Monroe died domiciled in California, asserted to obtain the benefit of California's posthumous right of publicity statute, is inconsistent with the preceding forty years of representations on behalf of the estate that Monroe died domiciled in New York.

## C.

Although Monroe LLC acknowledges that Frosch and Strasberg represented that Monroe died a domiciliary of New York, they contend that the estate did not successfully advance these positions. However, the estate succeeded in persuading numerous judicial and quasi-judicial bodies to accept that Monroe died a domiciliary of New York. In the Los Angeles County Superior Court probate proceedings, the Inheritance Tax Appraiser reported, and the court agreed, that Monroe died domiciled in New York. And in the District of Hawaii, the court relied upon Strasberg's representations that Monroe died domiciled in New York to conclude that Miracle failed to state a claim against the estate. Although the New York Surrogate's Court did not accept the Hawaii decision as res judicata, it also applied New York law, and not California law, to dismiss Miracle's claims, based on its acceptance of the representation that Monroe died a domiciliary of New York. Indeed, the very fact that the New York Surrogate's Court exercised jurisdiction over Monroe's probate proceed-

ings demonstrates that it was persuaded by Frosch's representations that it had jurisdiction over Monroe's estate. *See* N.Y. Surr. Ct. Proc. Act § 205 ("The surrogate's court of any county has jurisdiction over the estate of a decedent who was a domiciliary of the state at the time of his death, disappearance or internment."). That Monroe died a domiciliary of New York was a predicate for the Surrogate Court's exercise of jurisdiction for almost forty years. Never did Frosch, Strasberg, or any party to the probate proceedings dispute the authority of the New York courts to probate Monroe's will. Judicial and quasi-judicial officers repeatedly accepted and relied upon the estate's representations about Monroe's New York domicile.

## D.

The district court concluded that permitting Monroe LLC to assert that Monroe died a domiciliary of California in this litigation would unfairly allow it to obtain a "second advantage." *Milton H. Greene*, 568 F. Supp. 2d at 1197. We agree. Judicial estoppel is intended to protect the courts, and Milton Greene need not prove that it detrimentally relied on the prior representations about Monroe's domicile to justify our application of judicial estoppel. *See In re Coastal Plains, Inc*., 179 F.3d 197, 205 (5th Cir. 1999). It is clear that Monroe LLC desires to prove that when Monroe died she was domiciled in California so that it can gain the significant advantage of California law, which, at its behest, now provides for a descendible, posthumous right of publicity that may pass through the residual clause of the decedent's will. If this position is accepted by the courts, this right would have passed through the residual clause of Monroe's will, as specifically provided in the amended California Civil Code § 3344.1. Monroe LLC would gain Monroe's right of publicity, which carries the "immeasurable value of the name, likeness, and persona of Marilyn Monroe."

We have no doubt that the only way that Monroe LLC would ever secure the right to assert Monroe's right of publicity is if we accept its current representation that Monroe died domiciled in California and allow Monroe LLC to attempt to prove up that fact at trial. Monroe LLC would reap tremendous financial benefits if it could lay claim to Monroe's right of publicity. *Forbes Magazine* identifies Monroe as the third-highest money-maker in its annual ranking of "The Top-Earning Dead Celebrities," with an income of $27 million in 2011.[14] Ownership of Monroe's right of publicity would allow Monroe LLC to control and profit from most, if not all, commercial exploitations of Monroe's name, likeness and persona. Monroe LLC would thus derive a substantial advantage —one which it contrived to create through the California legislature—were it not estopped from asserting its current position.

Conversely, Milton Greene has already suffered a detriment as a result of Monroe LLC's litigation of its asserted rights to Monroe's right of publicity. The Milton Greene cases and other attempted enforcement actions by Monroe LLC, like those that led to the *Shaw Family Archives* case, have forced Monroe photographers into lengthy litigation in order to simply defend their right to profit from their copyrighted photographs. If Monroe LLC were to succeed in establishing ownership of Monroe's right of publicity, Milton Greene's ability to commercially exploit the photographs that it created and in which it owns copyrights would be subject to Monroe LLC's control. Further, allowing Monroe LLC to now represent that Monroe died domiciled in California would create the perception that either prior courts or we have been misled by representations about her domicile. The need to preserve the dignity of judicial proceedings weighs heavily against

---

[14]*See* Dorothy Pomerantz, *The Top-Earning Dead Celebrities*, Forbes Mag. (Oct. 25, 2011), http://www.forbes.com/sites/dorothypomerantz/2011/10/25/the-top-earning-dead-celebrities/.

allowing Monroe LLC to proceed down its newly charted path.

**[9]** This is a textbook case for applying judicial estoppel. Monroe's representatives took one position on Monroe's domicile at death for forty years, and then changed their position when it was to their great financial advantage; an advantage they secured years after Monroe's death by convincing the California legislature to create rights that did not exist when Monroe died. Marilyn Monroe is often quoted as saying, "If you're going to be two-faced, at least make one of them pretty."[15] There is nothing pretty in Monroe LLC's about-face on the issue of domicile. Monroe LLC is judicially estopped from taking the litigation position that Monroe died domiciled in California. Our conclusion in this regard is guided by the need to preserve the dignity of judicial proceedings that have taken place over the last forty years and to discourage litigants from "playing fast and loose with the courts." *See Hamilton*, 270 F.3d at 782.

## IV.

**[10]** Because Monroe died domiciled in New York, New York law applies to the question of whether Monroe LLC has the right to enforce Monroe's posthumous right of publicity. Because no such right exists under New York law, Monroe LLC did not inherit it through the residual clause of Monroe's will, and cannot enforce it against Milton Greene or others similarly situated. We observe that the lengthy dispute over the exploitation of Marilyn Monroe's persona has ended in exactly the way that Monroe herself predicted more that fifty years ago: "I knew I belonged to the Public and to the world, not because I was talented or even beautiful but because I had never belonged to anything or anyone else."[16]

We AFFIRM the district court's judgment.

---

[15]Although numerous persons have attributed this quote to Monroe, we have been unable to locate a definitive source.

[16]Marilyn Monroe, *My Story* 123-24 (Cooper Square Press 2000).